ATTORNEYS FOR PETITIONERS:
**DAVID F. McNAMAR**
McNAMAR & ASSOCIATES, P.C.
Westfield, IN

**JAMES K. GILDAY**
GILDAY & ASSOCIATES, P.C.
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**PARVINDER K. NIJJAR**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

FILED
Jan 04 2018, 4:05 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| PAUL J. ELMER and CAROL A. N. ELMER, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Cause No. 49T10-1110-TA-00064 |
| ) | |
| INDIANA DEPARTMENT OF STATE ) | |
| REVENUE, ) | |
| ) | |
| Respondent. ) | |

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF STATE REVENUE

**FOR PUBLICATION**
**January 4, 2017**

FISHER, Senior Judge

Paul J. Elmer and Carol A. N. Elmer have challenged the Indiana Department of State Revenue's assessments of Indiana adjusted gross income tax (AGIT) for the 2005 through 2008 tax years (the "years at issue"). The issue for the Court to decide is whether the Elmers established that two of Mr. Elmer's businesses were entitled to certain expense deductions. Upon review, the Court finds that they did not.

**FACTS[1] AND PROCEDURAL HISTORY**

The Elmers, a married couple of 37 years, live in Fishers, Indiana. (Trial Tr. at 11-12.) Mr. Elmer is a licensed pharmacist. (Trial Tr. at 12-13.) He began his career at a hospital in Kentucky, but when he discovered that job was "not what [he] wanted to do[,]" he obtained a new job at Hook's Drugs Stores. (Trial Tr. at 13.) After leaving Hook's, Mr. Elmer managed a friend's long-term care pharmacy and, then, the friend's mail order pharmacy. (See Trial Tr. at 13-15.) Mr. Elmer subsequently "took [a] leap of faith" and started his own pharmacy-related businesses. (See Trial Tr. at 12-13, 15.) Two of these businesses, both S-Corporations, are involved in this matter: Pharmakon Long Term Care Pharmacy, Inc. (f/k/a Liberty Express Scripts, Inc.) and Hamilton Consulting Group, Inc. (See Trial Tr. at 7; Confd'l Am. Stipulated Facts & Exs. ("Stip.") ¶¶ 2-3.)

Pharmakon was established in February of 2003. (Trial Tr. at 15.) Initially, the business operated a mail order pharmacy, with four employees in the basement of a building owned by Mr. Elmer's friend. (See Trial Tr. at 15-17.) As the business developed, it transitioned into an institutional pharmacy that sold prescription drugs and medical supplies primarily to long-term care facilities (e.g., psychiatric facilities, assisted-living facilities, and nursing homes) and their patients. (See Stip. ¶ 11; Trial Tr. at 15-16, 24-25.) During the years at issue, Pharmakon served as the primary pharmacy[2] for 41 long-term care facilities that were operated by affiliates of Magnolia Health Systems, Inc.,

---

[1] The parties' jointly stipulated facts and accompanying exhibits contain confidential information; accordingly, the Court will provide only that information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

[2] Mr. Elmer explained that primary pharmacies must execute written agreements with the long-term care facilities they serve that requires them to meet all the pharmaceutical needs of those facilities and their residents. (See Trial Tr. at 28.)

several separate businesses (i.e., Magnolia and the Magnolia affiliates) owned primarily by a long-time acquaintance of Mr. Elmer, Stuart Reed. (See Stip. ¶ 12, Confd'l Ex. 10, Confd'l Ex. 19 at Pet'rs' Ex. 2 ¶¶ 4-6; Trial Tr. at 25-26.)

Messrs. Elmer and Reed, representing Pharmakon, Magnolia, and the Magnolia affiliates, conducted business with little formality, meeting periodically to "talk through things and . . . agree on how [they] were going to do [things.]" (See Trial Tr. at 27-28; Stip., Confd'l Ex. 19 at 21.) Accordingly, unless specifically mandated by law, the two did not memorialize the contours of their business relationships with written contracts. (See, e.g., Trial Tr. at 27 ("I would call him, but it was never where I would have a contract saying[,] 'In this contract you have to do this,' no, that's not the way I do business").) Beginning in 2007, some of Pharmakon's customers, including many of the Magnolia affiliates, failed to pay Pharmakon for amounts invoiced. (See, e.g., Stip., Confd'l Exs. 12-12(11).) By the end of 2008, those uncollected amounts totaled approximately $650,000. (See Trial Tr. at 49-50; Stip., Confd'l Exs. 12-12(b), Confd'l Ex. 19 at Pet'rs' Ex. 2 ¶¶ 6-8.) At some point, the companies stopped doing business together, but it is not clear when their business relationship was terminated. (See Trial Tr. at 27.)

Hamilton was established a year after Pharmakon in 2004 to expand Pharmakon's footprint within the pharmaceutical industry. (See Stip. ¶ 3; Trial Tr. at 35, 37-39.) During the years at issue, Hamilton's business address was at Mr. Elmer's residence and it had no employees. (See Trial Tr. at 56.) Hamilton (via Mr. Elmer) initially conducted a few educational seminars on behalf of different pharmaceutical companies to introduce pharmacists to new products and treatments for certain ailments. (See Trial Tr. at 35-37.) Once those opportunities "fizzle[d] out[,]" Hamilton (again via Mr. Elmer) verbally

3

agreed to coordinate the provision of certain respiratory care services to long-term care facilities for Pharmakon. (See Trial Tr. at 36-38, 56-57; Stip. ¶ 14.) At that time, Pharmakon had at least one "account" with a non-Magnolia affiliated nursing home and employed at least one respiratory therapist to provide the services. (See Trial Tr. at 37-38.) When Mr. Elmer determined that his customer base prevented Pharmakon from employing respiratory therapists any longer, he sought out the advice of Mr. Reed. (See Trial Tr. at 37-38, 43-44.) Messrs. Elmer and Reed verbally agreed that: 1) Augusta Corporation, another of Mr. Reed's companies, would provide licensed respiratory therapists to administer the respiratory care services; 2) Augusta would order all medications and supplies used to provide its services from Pharmakon; and 3) Hamilton would continue to coordinate the provision of all those services on behalf of Pharmakon. (See, e.g., Trial Tr. at 38-45, 57-58; Stip. ¶ 17.) Thereafter, Hamilton also began to provide similar services to Magnolia-affiliated long-term care facilities. (See Trial Tr. at 40-41.)

Throughout the 2005 through 2007 tax years, Pharmakon was Hamilton's only customer. (See Trial Tr. at 40-41; Stip., Confd'l Ex. 2 at 7.) Pharmakon paid Hamilton approximately $9 million for "contract labor" services during all the years at issue, and Hamilton, in turn, paid Augusta about $7 million for "consulting" services. (See Stip. ¶¶ 14, 20-21, Confd'l Ex. 1 at 7-8, Confd'l Ex. 2 at 8, 11, Confd'l Ex. 11; Trial Tr. at 48-49.)

The Department subsequently audited Pharmakon and Hamilton for the years at issue. (See Stip. ¶ 5, Confd'l Exs. 1-2.) On September 15, 2010, the Department issued separate Audit Summary Reports to Pharmakon and Hamilton that disallowed some of their expense deductions because the Elmers had not demonstrated that the

4

requirements for deductibility were met. (See Stip. ¶¶ 5-6, Confd'l Ex. 1 at 6-10, Confd'l Ex. 2 at 6-10.) Specifically, Pharmakon's Audit Summary Report stated that the Department disallowed: 1) contract labor expenses of about $9 million; 2) car allowance and vehicle depreciation expenses totaling over $50,000; and 3) uncollectible debt expenses of about $650,000. (See Stip. ¶¶ 14, 26-28, Confd'l Ex. 1 at 7-10.) In contrast, Hamilton's Audit Summary Report provided that the Department disallowed: 1) consulting expenses of about $7 million; 2) vehicle expenses of about $9,000; 3) a management fee of approximately $700,000; and 4) a variety of other expenses (e.g., depreciation, contract labor, meals/entertainment, office equipment/supplies, and dry cleaning) that totaled over $100,000. (See Stip. ¶¶ 20-24, Confd'l Ex. 2 at 7-11, Confd'l Ex. 11.)

On December 17, 2010, the Department issued Proposed Assessments to the Elmers imposing over $400,000 of additional AGIT, interest, and penalties for the years at issue. (See Stip. ¶ 7, Confd'l Exs. 3-7.) See also Riverboat Dev., Inc. v. Indiana Dep't of State Revenue, 881 N.E.2d 107, 109 n.4 (Ind. Tax Ct. 2008) (explaining that the income and losses of an S-Corporation are passed through to its owners (i.e., shareholders) who, in turn, report their pro-rata shares on their individual tax returns), review denied. On April 19, 2011, the Elmers protested the Proposed Assessments, and on August 31, 2011, the Department issued a Letter of Findings that ultimately denied their protest. (See Stip. ¶¶ 8-9, Confd'l Exs. 8-9.) See also Elmer v. Indiana Dep't of State Revenue, 42 N.E.3d 185, 188 n.2 (Ind. Tax Ct. 2015).

On October 25, 2011, the Elmers initiated this original tax appeal. On January 23, 2017, after the Department's motion for summary judgment was denied, (see generally id.), the Elmers' appeal proceeded to trial. The Court heard oral argument on June 2,

2017.  Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

This Court reviews final determinations of the Department de novo.  IND. CODE §
6-8.1-5-1(i) (2017).  Accordingly, the Court is not bound by the evidence or the issues
presented to the Department at the administrative level.  Horseshoe Hammond, LLC v.
Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

## LAW

During the years at issue, Indiana's adjusted gross income tax incorporated
Section 63 of the Internal Revenue Code, defining "taxable income" as the starting point
for calculating a corporation's Indiana adjusted gross income.  See IND. CODE § 6-3-1-
3.5(b) (2005) (amended 2006).  IRC § 63 provided that "taxable income" meant "gross
income minus the deductions allowed by this chapter (other than the standard
deduction)."  I.R.C. § 63(a) (2005).  Two independent types of deductions allowed under
IRC § 63 are at issue here:  the business expense deduction under IRC § 162 and the
uncollectible debt deduction under IRC § 166.  See generally I.R.C. §§ 162, 166 (2005).
The business expense deduction permits taxpayers to deduct "the ordinary and
necessary expenses paid or incurred . . . in carrying on any trade or business[.]"  I.R.C. §
162(a).  The uncollectible debt deduction allows taxpayers to deduct either in whole or in
part "any debt that becomes worthless within [a] taxable year."  I.R.C. § 166(a).

## ANALYSIS

The dispositive issue is whether the Elmers established that Pharmakon and

Hamilton were entitled to certain expense deductions during the years at issue.[3]  The Department has maintained throughout these proceedings that the Elmers cannot substantiate any of the contested expense deductions given Mr. Elmer's use of oral agreements and lack of written documentation.  (See, e.g., Resp't Confd'l Post-Trial Br., Marked "Not For Public Access["] Pursuant To Ind. Trial Rule 5(G) ("Resp't Br.") at 5-8; Oral Arg. Tr. at 14-15.)  The Court has previously explained, however, that nothing within Indiana's AGIT statutory scheme or relevant case law provides that written documentation is the only method for a taxpayer to substantiate its federal expense deductions for purposes of determining its Indiana AGIT liability.  See Elmer, 42 N.E.3d at 194 n.12.  Furthermore, Indiana does not prohibit the use of oral contracts.  See, e.g., Fox Dev., Inc. v. England, 837 N.E.2d 161, 165 (Ind. Ct. App.  2005) (providing that "[f]or an oral contract to exist, [the] parties have to agree to all the terms of the contract") (citation omitted).  Accordingly, the resolution of the matters at hand primarily depends on the probative value of, or the weight afforded to, the trial evidence.

To that end, the Elmers have conceded that they cannot substantiate Pharmakon's car allowance and vehicle depreciation expense deductions of over $50,000 and Hamilton's vehicle, management fee, and meal/entertainment expense deductions of approximately $715,000.  (See Stip. ¶ 24; Pet'rs' Confd'l Post-Trial Reply Br., Marked "Not For Public Access" Pursuant to Ind. Trial Rule 5(G) ("Pet'rs' Reply Br.") at 21 n.25; Oral Arg. Tr. at 21-22.)  Consequently, the expense deductions that remain at issue are

---

[3] Although the parties also appear to dispute whether the claimed expense deductions comported with the "ordinary" and "necessary" requirements of IRC § 162 and whether they had economic substance, the Court will not address those disputes because the case is resolved on other grounds. (Compare, e.g., Pet'rs' Post-Trial Br. at 2-7 with Resp't Confd'l Post-Trial Br. Marked "Not For Public Access["] Pursuant to Ind. Trial Rule 5(G) at 4.)

Pharmakon's deductions for contract labor and uncollectible debt as well as Hamilton's deductions for consulting services and miscellaneous items (e.g., depreciation, dry cleaning, or office supplies).

The Elmers' primary claim is that they substantiated Pharmakon's and Hamilton's expense deductions at trial because the Department simply ignored their evidence and "continue[d] to advance the unsupported theory that verbal contracts . . . must be in writing in order for any expenditures resulting therefrom to be deducted." (See Pet'rs' Reply Br. at 17.) (See also, e.g., Oral Arg. Tr. at 8-14.) During the trial, the Elmers offered a variety of evidence to substantiate the contested expense deductions, including the testimony of Mr. Elmer, Mr. Reed, and Pharmakon's senior accountant; patient's treatment administration records; Augusta's invoices; and Pharmakon's "accounts receivable open item list" reports for the period between January 1, 2007 and December 31, 2008. (See, e.g., Stip., Confd'l Exs. 11, 12-12(11), 19, 21.) The Elmers' evidence, however, has numerous infirmities and the Court cannot conclude that the Elmers have substantiated the expense deductions at issue. In order to address the infirmities with the evidence – yet conserve judicial resources – the Court's opinion today will discuss only the most glaring infirmities regarding: A) Pharmakon's deductions for contract labor; B) Hamilton's deductions for consulting services; C) Hamilton's deductions for miscellaneous items; and D) Pharmakon's deduction for uncollectible debt.

**A.**

To establish Pharmakon's eligibility for the contract labor deductions, Mr. Elmer testified at trial that he arranged for Hamilton to coordinate the provision of respiratory care services at long-term care facilities on behalf of Pharmakon. (See Trial Tr. at 40-41,

55, 61.) He further explained that he ran monthly reports to determine the amount of money that Pharmakon should pay Hamilton, which largely depended on the amount of money that Hamilton owed Augusta. (See Trial Tr. at 48-49.) In addition, the Elmers and the Department stipulated that Pharmakon paid Hamilton approximately $9 million during the years at issue and that Hamilton paid about 80 percent of those proceeds to Augusta. (See Stip. ¶¶ 14, 20.)

While Mr. Elmer's testimony describes the interactions of Pharmakon and Hamilton in general terms, the lack of detail significantly detracts from its probative value. See, e.g., Barth, Inc. v. State Bd. of Tax Comm'rs, 756 N.E.2d 1124, 1128 (Ind. Tax Ct. 2001) (providing that "probative evidence" is "evidence that is 'sufficient to establish a given fact and which if not contradicted will remain sufficient'") (citation omitted). For instance, there is no indication as to who actually coordinated the provision of respiratory care services given that Hamilton had no employees during the years at issue. Furthermore, the trial evidence does not reveal what specifically Hamilton's coordination efforts were, leaving the Court to only surmise the amount of time that might be consumed in coordinating those activities. Finally, the Court cannot ascertain whether Hamilton's fee was based on a specified rate given the absence of invoices from Hamilton to Pharmakon or any specific testimony on the subject. The Court finds this overall lack of detail especially troubling given that Pharmakon was Hamilton's only customer until 2008. Consequently, the Elmers have not provided reliable and credible evidence to establish that Pharmakon was entitled to an expense deduction for contract labor.

**B.**

With respect to substantiating Hamilton's expense deductions for consulting

services, the Elmers presented certain written documentation (e.g., patient's treatment administration records and Augusta's invoices) as well as the testimony of Messrs. Elmer and Reed. This evidence indicated that Messrs. Elmer and Reed had verbal agreements about a variety matters, including respiratory therapy services, Medicare reimbursements, software analysis, and the preparation of cost reports. (See, e.g., Stip., Confd'l Ex. 19 at 34-35, 53-54, Pet'rs' Ex. 1 ¶ 3, Pet'rs' Ex. 2 ¶¶ 12-13.) Furthermore, while Mr. Elmer attempted to establish that Augusta's respiratory therapists performed their end of the agreement by stating that the initials on the patient's treatment administration records were those of Augusta's respiratory therapists, Mr. Reed was not sure if this was in fact the case. (See Trial Tr. at 41-43; Stip., Confd'l Ex. 19 at 49-51, Pet'rs' Ex. 3.)

The Court finds that the statements of Messrs. Elmer and Reed lacked probative value because they were nothing more than unsubstantiated conclusions. See, e.g., Blesich v. Lake Cnty. Assessor, 46 N.E.3d 14, 17 (Ind. Tax Ct. 2015) (providing that "[c]onclusory statements do not constitute probative evidence") (citation omitted). Indeed, the trial evidence does not indicate that Mr. Elmer had actual knowledge of the identities of the respiratory therapists; accordingly, his ability to identify them based on their initials is doubtful. Additionally, when Mr. Reed was asked about the specifics of the agreements, particularly those regarding the respiratory therapy services, he could not recall the details and deferred to his previously completed affidavits. (See, e.g., Stip., Confd'l Ex. 19 at 34-46, 65-66.) The affidavits, however, do not provide any further details about the terms of any of the agreements. (See generally Stip., Confd'l Ex. 19, Pet'rs' Ex. 1-2.) Moreover, the Court cannot definitively determine what Hamilton's payments to

10

Augusta were actually for because each of Augusta's invoices was labeled for "marketing and management" services, an undisclosed number of them may have included remuneration for respiratory care services and other services, and the attachments that provided a break-down of the services actually performed were not available. (See, e.g., Stip., Confd'l Ex. 11, Confd'l Ex. 19 at 44-47, 58-60.) This overall lack of detail regarding the terms of the agreements between Hamilton and Augusta substantially detracts from the probative value of this evidence. Consequently, the Elmers did not substantiate Hamilton's expense deductions for consulting services.

**C.**

The Elmers also claim that the Department erred in disallowing Hamilton's miscellaneous expense deductions (e.g., bank service charges, dry cleaning expenses, and dues/subscriptions) because "[f]oundational documentary evidence exists and was provided for all of the remaining claimed deductions; i.e., general ledgers." (See Pet'rs' Post-Trial Br. ("Pet'rs' Br.") at 10; Stip. ¶ 23.) The general ledgers that the Elmers referenced, however, were never admitted into evidence during the trial. (See generally Trial Tr.) Therefore, the Court cannot determine whether they substantiate Hamilton's miscellaneous expense deductions. Because the Elmers presented no further specific arguments or evidence regarding Hamilton's miscellaneous expense deductions, (see generally Trial Tr.; Pet'rs' Br.; Pet'rs' Reply Br.; Oral Arg. Tr.), the Court cannot say that the Elmers demonstrated that Hamilton was entitled to any of the miscellaneous expense deductions. See, e.g., Blesich, 46 N.E.3d at 17 (stating that taxpayers have a duty to walk the Court through every element of their analyses).)

**D.**

Finally, with respect to Pharmakon's uncollectible debt deduction of approximately $650,000, the parties stipulated that Pharmakon's 2008 amended tax return contained a statement on the line for "returns and allowance" that read "this was for 'the amount that was improperly billed after the reimbursement period had expired.'" (Stip. ¶ 26.) Mr. Elmer subsequently explained that this statement was imprecise because approximately $200,000 of the deduction was attributable to billing mistakes and the other $450,000 was attributable to the Magnolia's affiliates' failure to pay several invoices. (See Trial Tr. at 52-53.)

**The Billing Mistakes**

The Elmers' evidence indicated that either the private pay patients themselves or their insurers were liable for the debt arising from Pharmakon's billing mistakes. (See Trial Tr. at 49-53; Stip., Confd'l Ex. 21 at 15-17.) Mr. Elmer explained that in 2008 Pharmakon incorrectly "booked income" arising from several private pay patient transactions and when Pharmakon rebilled those patients' insurance companies, the time for doing so had lapsed and it never received payment for those transactions. (See Trial Tr. at 52-53.) As support, the Elmers presented Pharmakon's "accounts receivable" reports. (See Stip., Confd'l Exs. 12(c)-(11); Confd'l Ex. 21 at 17-20.) These computer-generated reports contained a variety of information, including hundreds of patient names as well as drug descriptions, transaction dates, prescription costs, and "write off" dates. (See Stip., Confd'l Exs. 12(c)-(11).) The reports also contain a variety of handwritten notes regarding the name of the patients' insurers, rebilling dates, other dates, costs, and other figures. (See, e.g., Stip., Confd'l Exs. 12(c), 12(j).) While no further testimony

12

regarding the handwritten notes or computer-generated aspects of the reports was provided during the trial, (see generally Trial Tr.; Stip., Confd'l Ex. 21), Pharmakon's senior accountant explained that its former chief operating officer (COO) had determined that the debt was uncollectible, but she did not know when that determination was made. (See Stip., Confd'l Ex. 21 at 9-10, 13, 15, 20-21.)

When taxpayers claim an uncollectible debt expense deduction, they must, among other things, establish that they "exhaust[ed] the usual and reasonable means of collection before they are entitled to the deduction." Newman v. Comm'r, 80 T.C.M. (CCH) 661, 2000 WL 1675519, at *4 (T.C. 2000) (citation omitted). Indeed, the deduction may be disallowed if taxpayers fail to demonstrate that collection efforts are futile. See id. Here, while the evidence shows that either private pay patients or their insurers were liable for the amounts that were uncollected due to billing mistakes, it provides no indication about what portion, if any, of the $200,000 liability was attributable to the private pay patients themselves as opposed to their insurers. Moreover, the evidence does not indicate what collection measures, if any, Pharmakon employed with respect to the private pay patients. This particularly strains credulity given that some of those patients were designated as employees of Pharmakon or "friends and family." (See Stip., Confd'l Exs. 12(d) at 2, 12(11) at 2-3.) In addition, the handwritten notes indicate that in some instances Pharmakon rebilled insurance companies in November of 2009 after filing its amended tax return. (See Stip., Confd'l Ex. 12(d) at 5; Confd'l Ex. 1 at 9 (providing Pharmakon filed the 2008 amended return in October of 2009).) In other instances, the handwritten notes put the actual amount of the outstanding liability in dispute. (See Stip., Confd'l Ex. 12(c) at 1-2.)

13

The Elmers generically referred to Pharmakon's reports as though they speak for themselves, and in so doing, they diminished the probative value of that evidence. See, e.g., Indianapolis Racquet Club, Inc. v. Washington Twp. (Marion Cnty.) Assessor, 802 N.E.2d 1018, 1022 (Ind. Tax Ct. 2004), review denied. The Elmers also failed to walk the Court through every element of their analysis and, as a result, the Court cannot discern whether sufficient collection efforts were undertaken, whether the stated amount of the debt was truly uncollectible, and if so, when the debt was determined to be uncollectible. Accordingly, the Elmers have not substantiated this expense deduction either.

**The Magnolia Affiliates**

During trial, the Elmers explained that the other portion of Pharmakon's uncollectible debt deduction arose from some of the Magnolia affiliates' inability to pay several invoices. (See Trial Tr. at 49-52; Stip., Confd'l Exs. 12(a)-(b).) Mr. Reed averred that 15 of the 41 Magnolia affiliates stopped operating certain long-term care facilities between August of 2007 and December of 2008 and that they "did not have sufficient funds to pay all outstanding obligations." (See Stip., Confd'l Ex. 19 at Pet'rs' Ex. 2 ¶¶ 6-8.) In addition, the Elmers presented two documents that summarized the specific amounts of the Magnolia affiliates' outstanding liabilities. (See Stip., Confd'l Ex. 21 at 12-15; Confd'l Exs. 12(a)-b).) One document attributed the entire $450,000 expense deduction to 34 of the Magnolia affiliates, including 13 of the 15 insolvent Magnolia affiliates. (See Stip., Confd'l Ex. 12(a), Confd'l Ex. 19 at Pet'rs' Ex. 2 ¶ 6.) The other document attributed the expense deduction to 38 of the Magnolia affiliates, which included all 15 of the insolvent Magnolia affiliates. (See Stip., Confd'l Ex. 12(b); Confd'l Ex. 19 at Pet'rs' Ex. 2 ¶ 6.) The Elmers did not explain these inconsistencies nor did they

14

offer documentary evidence or some other evidence that detailed the summarized amounts of the purportedly uncollectible debt.

The parties also offered a series of email communications between Mr. Elmer, Mr. Reed, and Pharmakon's former COO, within which Mr. Reed suggested that they could "do a write[-]off to reduce taxes" in response to Mr. Elmer informing him that "Magnolia's outstanding accounts" were problematic. (See Stip., Confd'l Ex. 14 at 4-5.) Although Messrs. Elmer and Reed apparently agreed to write-off some of the debt by October 7, 2009, Mr. Reed did not know which of the 2008 invoices were being written-off and continued to make payments on some of those invoices. (See Stip., Confd'l Ex. 14 at 1-3.) When asked about these emails during cross-examination, Mr. Elmer stated that while he and Mr. Reed had an oral agreement for repayment of a portion of the debt, he could not recall any of the agreement's terms. (See Trial Tr. at 59.) Mr. Elmer also could not recall whether Pharmakon continued to receive payments on the debt in 2009. (See Trial Tr. at 59-60.) Mr. Reed, in turn, could not recall the precise amount of the outstanding liability or whether all 15 of the insolvent Magnolia affiliates paid the outstanding invoices.[4] (See Stip., Confd'l Ex. 19 at 27-28.)

As previously mentioned, IRC § 166(a) allows a deduction for "any debt which becomes worthless within [a] taxable year." I.R.C. § 166(a)(1). The debt must be "bona fide," meaning that it must arise "from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." See Treas. Reg. § 1.166-1(c) (2005) (emphasis added). Here, the absence of reliable or credible

---

[4] Mr. Reed also indicated that the former controller of Magnolia and Pharmakon's former COO either were the same person or merely shared the same name. (Compare, e.g., Stip., Confd'l Ex. 19 at 31-32 with Confd'l Ex. 21 at 20-21.)

15

evidence of the terms of the oral agreement as well as the inconsistencies in the testimonial and documentary evidence raise several questions regarding not only the timing of the determination of worthlessness of this purported debt, but also the Magnolia affiliates' ability to repay the debt given that most were solvent. The Court, therefore, cannot determine either the amount of the debt associated with the Magnolia affiliates or whether the unpaid debts were actually worthless during the 2008 tax year. Accordingly, the Court cannot say that the Elmers established Pharmakon's entitlement to this portion of uncollectible debt deduction as well.

## CONCLUSION

Indiana Code § 6-8.1-5-4 requires every person subject to the AGIT to keep certain books and records so that the Department may review them and determine the amount of the person's AGIT liability. See IND. CODE § 6-8.1-5-4(a) (2005). While the statute does not provide an exhaustive list of, or implement a bright-line rule regarding, what constitutes adequate books and records, the Court finds vague oral agreements lacking credible documentary support, like the oral agreements here, simply will not suffice. Having considered the parties' arguments and weighed the evidence offered at trial, the Court concludes that the Elmers did not establish that Mr. Elmer's businesses were entitled to the contested expense deductions. Consequently, the Court AFFIRMS the Department's final determination for the years at issue.